UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

OKINE SEWELL,

Defendant.

25-CR-284 (DEH)

**OPINION AND ORDER**

---

DALE E. HO, United States District Judge:

On June 5, 2025, eight New York City Police Department ("NYPD") officers approached Defendant Okine Sewell at the intersection of 204th Street and Valentine Avenue in the Bronx, where Mr. Sewell was seated next to a speaker outside a convenience store. Officers followed Mr. Sewell to a Chinese restaurant and then attempted to issue a summons for excessive noise. Mr. Sewell gave a fake name, leading officers to arrest him in order to effectuate the summons, during the course of which officers uncovered a firearm and drugs.

Before the Court are two motions brought by Mr. Sewell. He first moves to dismiss Count IV—possession of a firearm after a felony conviction—as violative of the Second Amendment. ECF No. 19. For reasons stated below, that motion is **DENIED**.

Mr. Sewell's second motion seeks to suppress the firearm and drugs recovered by officers as the fruit of an allegedly unlawful arrest. ECF No. 21. He argues that officers lacked probable cause to find Sewell had violated the statute, which required officers to reasonably determine (1) that the noise was sufficiently loud as to violate New York City Administrative Code § 24-218, which prohibits "unreasonable noise," and (2) that Sewell was the source of the noise. The Court held a fact hearing on December 15, 2026 in which two of the officers testified to the events of June 5. The Court also accepted the body camera footage of all eight officers into evidence, as well as exhibits depicting the street layout surrounding 3044 Valentine Avenue.

As described below, the Court concludes that, based on the following findings of fact, officers lacked probable cause to issue Mr. Sewell a summons for excessive noise, and that any evidence uncovered through a search incident to Mr. Sewell's arrest must be suppressed. Accordingly, Mr. Sewell's motion to suppress is **GRANTED**.

**FINDINGS OF FACT**

### I.    Undisputed Facts Regarding Mr. Sewell's Arrest

3044 Valentine Avenue is a commercial building located on the corner of Valentine Avenue and 204th Street in the Bronx, NY.   Transcript of Suppression Hearing, December 15, 2025 ("Tr.") 37-38, ECF No. 30.  The building houses a 99-cent store and is located next to a series of delis and groceries.  *Id.*  The corner is primarily commercial in nature though some apartment buildings are located nearby.



Def. Ex. 1.

On June 5, 2025, Defendant Okine Sewell was seated outside these delis in a chair. Tr. 60. It was a warm, sunny summer day, and several individuals are seen walking in Mr. Sewell's vicinity. Tr. 55; *see generally* Govt. Exs. A-H (Body Camera Footage).



Ex. G, Body Camera Footage of Officer Lindquist, at 0:04 (showing the grocery store on Valentine Avenue with the chair in which Mr. Sewell was seated, a speaker to the left of the chair, and Mr. Sewell walking away in a red oval). There was some vehicle traffic in the area, as officers are heard being asked to move their vehicles out of the way for cars to pass. Ex. A, Body Camera Footage of Officer, Jimenez, at 1:15-1:27.

Just before 5:00 p.m., eight uniformed officers arrived at 3044 Valentine and approached Mr. Sewell, at which point he got up and slowly walked into a Chinese restaurant. Tr. 15-16. Officers followed him to the restaurant and asked him to come outside and speak with them. Tr. 68. Officers informed Mr. Sewell that he was being given a summons for excessive noise, Tr. 21-22, at which point Mr. Sewell gave a fake name to officers, "Tyrone Brown," as well as his real date of birth. Ex. F, Body Camera Footage of Officer Boland, at 2:00-2:30. Because no "Tyrone

3

Brown" appeared in the NYPD database with that birthdate, *id.*, officers arrested Mr. Sewell to effectuate the summons.  A search incident to that arrest uncovered a firearm, 97 capsules of crack cocaine, and a wad of cash.   Ex. G, Body Camera Footage of Officer Lindquist, at 7:45-8:15, 11:45-13:05.

## II.    Evidentiary Submissions Regarding Probable Cause for Excessive Noise

The question before the Court is whether the officers had probable cause to issue Mr. Sewell a summons for violating New York City Administrative Code ("NYC Code") § 24-218, which prohibits "unreasonable noise."  The Code defines unreasonable noise as "any excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities." NYC Code § 24-203(62).   Thus, at a hearing before this Court, the Government offered evidence in an effort to meet its burden to show that a reasonable officer could have reasonably determined that Mr. Sewell had made "excessive or unusually loud sound" within the meaning of § 24-203(62).  *See United States v. Lefebvre*, 117 F.4th 471, 476 (2d Cir. 2024).

### A.    Officer Boland's Testimony

The Government first called Officer Christopher Boland.  Officer Boland was a police officer for the NYPD stationed in the 52nd precinct in the Bronx. Tr. 7.  Officer Boland served as a neighborhood coordination officer, where his job was to host community meetings and work with community members directly to address day-to-day issues, including noise complaints.  *Id.* He testified that he was familiar with the area of 3044 Valentine Avenue. *Id.* at 9, 27.

Officer Boland testified that, on June 5, 2025, he "believe[d]" he went to 3044 Valentine because of a noise complaint, "[b]ecause of the amount of times that [he'd] been there for either a noise complaint or a narcotics use or sales call." Tr. 14.  Officer Boland testified that, in the past, the main ways that he would receive noise complaints from community members were through 911 calls or direct contact to his cellphone. Tr. 8, 12-13.  In fact, the building manager had reached

4

out to him with complaints "at least over 50 times" over the course of approximately three years, usually either by calling or texting.  Tr. 12.  These complaints were also sometimes relayed to Officer Boland via a supervisor.  Tr. 12-13, 53-54.

On the day in question, however, there is no record of any 911 or 311 calls for noise complaints at 3044 Valentine that day.  Tr. 28-30.  Officer Boland also did not have any calls or texts from the building manager in his call logs; he did not have any calls or text messages on his cellphone from his two supervisors that day; and he did not know whether his supervisors or anyone else on his neighborhood coordination team received a complaint about noise.  Tr. 28-31. Officer Boland believed that one of his supervisors told him about a noise complaint but could not recall any specific conversation.  Tr. 30-31.

Officer Boland described the area of 3044 Valentine as "busy" and stated that officers "usually have some issues" when responding to complaints there.  Tr. 15, 45.  He explained that eight officers went to 3044 Valentine at once to outnumber whoever might be there.  Tr. 45.  Upon arriving at the scene, Officer Boland heard loud music coming from a speaker on the ground next to a chair that Mr. Sewell was standing beside, and that he "[thought] it was loud enough that you'd be able to hear it from a block away."  Tr. 16-17.  But he also admitted that he did *not actually hear* the music from a block away, and agreed that it was "only when" he got out of his car nearby Mr. Sewell that he first heard the music:

> Q And it was only when you got out of the car after parking that you heard loud music, right?
>
> A Yes.
>
> Q You testified on direct that the music was loud enough to be heard from a block away, right?
>
> A I believe so, yes.
>
> Q But you did not hear music from a block away, right?

5

A Are you asking if I heard it from inside my vehicle?

Q I'm asking if you heard music from a block away from 3044 Valentine on June 5.

A No.

Tr. 32. Officer Boland could not recall any details of the music, such as the type of music that was playing. Tr. 16, 32. But he testified that as he and the other officers approached, he saw Mr. Sewell walking away from the chair and speaker, at which point the music stopped. Tr. 33.

### B.    Officer Nunez's Testimony

The Government next called Officer Andrew Nunez. Like Officer Boland, Officer Nunez served as a neighborhood coordination officer in the 52nd precinct. Tr. 58. Officer Nunez testified that he had also visited 3044 Valentine on many occasions, some of which included responding to noise complaints. *Id.* Officer Nunez did not testify regarding how officers became aware of a purported noise issue at 3044 Valentine. Officer Nunez did, however, testify that, as he and his partner approached 3044 Valentine, he could hear loud music playing from a block away as his squad car turned the corner onto Valentine Avenue. Tr. 59-60. On cross examination, Officer Nunez acknowledged that, in his preparation with the Assistant United States Attorney, he had stated that his squad car windows were rolled down, but he also acknowledged that this statement was contradicted by his body camera footage showing that the windows were, in fact, rolled up when he approached Mr. Sewell on June 5. Tr. 68-69; *see also* Ex. D, Body Camera Footage of Officer Nunez, at 0:43. Like Officer Boland, Officer Nunez similarly could not recall or describe the type of music that was playing. Tr. 60.

Officer Nunez testified that, when he arrived at 3044 Valentine, he saw Mr. Sewell sitting in the chair next to the speaker. Tr. 59-60. When Officer Nunez approached, Mr. Sewell stood up and walked into the Chinese restaurant. Tr. 60-61. Officer Nunez testified that as Mr. Sewell was

6

walking away, he saw Mr. Sewell turning down the volume on his phone with the side buttons and eventually all the way off. *Id.*

### C.    Body Camera Footage

The parties also presented body camera footage from each of the eight officers into evidence. NYPD body cameras work by constantly recording video, even when deactivated. Tr. 20. When an officer activates their body camera, the camera immediately begins recording sound and video. *Id.* The camera also saves the preceding one minute of recorded video; however, no sound is included with this initial one-minute recording. *Id.*

The body camera footage for each of the eight officers shows officers parking their squad cars in front of 3044 Valentine Avenue and approaching Mr. Sewell. *See* Exs. A-H. Each officer appears to have activated their cameras after Mr. Sewell had already begun walking toward or into the Chinese restaurant. *Id.* at 0:00-1:00. As a result, none of the eight cameras captured sound while music was still playing from the speaker. The cameras also show numerous bystanders walking past Mr. Sewell and lingering in the area surrounding 3044 Valentine both before and after officers arrive. *See, e.g.*, Ex. E, Body Camera Footage of Officer Mancilla, at 0:50-0:55 (showing a man walking his dog on the street and several other individuals standing and chatting outside the 99-cent store). Body camera footage also shows Mr. Sewell fiddling with his phone around the time that Nunez testified to having seen Mr. Sewell turn the music off using the side buttons on his phone. *Id.* at 0:43-0:55; Ex. D, Body Camera Footage of Officer Nunez at 0:46-59. However, it is unclear from Officer Nunez's angle that he would have been able to see Mr. Sewell's hands; the action is more clearly viewed from angle of other officers to whom Mr. Sewell had not turned his back.

III.     **The Court's Assessment of the Evidence**

The Court begins with what is not in the record—namely, any evidence of loud noise other than the testimony of Officers Boland and Nunez. There is no evidence of a noise complaint being made, either a written record or other evidence of a complaint being made through the channels by which the officers have received dozens of noise complaints from the manager of 3044 Valentine Avenue and others in the area—such as 311 or 911 calls or calls or texts from citizens directly to the officers themselves. While Officer Boland testified that he "believe[d]" he was told by a supervisor of a noise complaint, there is no record of any calls or texts to him from his supervisors. He also acknowledged that he lacked any actual recollection of such a conversation, rendering his testimony that he believes he was told about a noise complaint pure speculation, which the Court declines to credit.

The body camera footage does not provide evidence of excessive noise. Eight officers had active body cameras, but no music was captured by the recordings. Dozens of people are featured in the camera footage, but no one complains about loud music, or acts as though they are being disturbed by music. At oral argument, the Government argued that one could infer simply from the size of the speaker that the music emanating from it would have been quite loud. Transcript of Oral Argument, January 29, 2026 ("Jan. 29 Hearing Tr.") 25-26. But the Government has introduced no evidence as to the volume of sound that a speaker of the size of the one at issue here (which, in footage, appears to be about the size of Mr. Sewell's lower leg, *see, e.g.*, Ex. D, Body Camera Footage of Officer Nunez, at 0:43), is in fact capable of producing.

The only evidence of noise that day is the testimony of the two officers. But Officer Boland's testimony, to the extent it is probative, tends to undermine the notion that any music that day was particularly loud. While he testified that he "th[ought] it was loud enough that you'd be able to hear it a from about a block away," Tr. at 16-17, he admitted that he did *not actually hear*

8

it from that far away, and agreed that it was only until he emerged from his parked vehicle nearby Mr. Sewell that he first heard the music, Tr. 32.

The only testimony, then, that the music was actually heard from a block away was from Officer Nunez. But the Court ultimately declines to credit this testimony for three reasons. First, Officer's Nunez's testimony in Court contradicted his earlier account of events in an important respect. He previously told the government during preparation for his testimony that his squad car windows were rolled down. Tr. 69:19-22. But his body camera footage showed that his windows were, in fact, rolled up, which he acknowledged in his testimony before the Court. Tr. at 68; Ex. D, Body Camera Footage of Officer Nunez, at 00:43. It is difficult for the Court to overlook Nunez's inconsistent statements with respect to that detail because it is seemingly important to his original account of events, insofar as it helped explain how he could have heard the music from substantial distance.

Second, Officer Nunez's testimony was not consistent with that of Officer Boland, who— although describing the music as loud enough to be heard a block away—testified that he did not in fact hear it from that distance, and that he actually heard the music for the first time only while emerging from his car nearby Mr. Sewell. Ex. F, Body Camera Footage of Officer Boland, at 0:30-0:42; Tr. 32. At oral argument, the Government sought to explain this discrepancy by noting that Officer Boland was driving his car, while Officer Nunez was a passenger in his, and argued that the greater distance of the driver's seat (as compared to the passenger's seat) from the sidewalk, coupled with the attention that a driver would need to pay to driving, could account for Officer Boland's inability ability to hear the music. Jan. 29 Hearing Tr. 28-29. The Court, however, is unpersuaded that the difference of a few feet inside of a car would account for such a difference. And as for the Government's contention that the concentration required of a driver would be sufficient to prevent Officer Boland's apprehension of the music, that would only suggest

9

that the music was not particularly loud. That is, if the sound in question was not sufficiently loud to interfere with that concentration, then that would tend to undermine the notion of excessively loud noise. *Cf. People v. Revi*, 81 Misc. 3d 142(A), 203 N.Y.S.3d 799 (N.Y. App. Div. 1st Dept. 2024) (finding probable cause where officer "heard music so loud that it diverted his attention from his assignment").

Finally, the absence of any other evidence of loud music, or of a noise complaint, makes it difficult to credit Officer Nunez's testimony. For music to be heard in a car with the windows rolled up from a block away, it would have to have been quite loud. It is striking, then, that there is no evidence of a noise complaint such as a call or text of the sort that Officer Boland indicated was common, and no indication that any of the bystanders in the body camera footage appear to be acting as though there is loud noise coming from the speaker. To be clear, the Court does not treat the absence of such corroborating evidence as evidence of absence—i.e., it does not necessarily tend to prove that there was *not* any loud music that day. But given the inconsistencies identified above, the lack of corroboration tends to undermine the weight that the Court can accord Officer Nunez's testimony. *See United States v. Norman*, 776 F.3d 67, 79 (2d Cir. 2015) ("[T]here is no requirement that a [witness's] sworn testimony be corroborated before it can be credited. Any lack of a corroboration for a witness's testimony—unless it is incredible on its face—goes merely to the weight of the evidence; the weight it is to be accorded is a matter for argument to the factfinder, not a ground for reversal on appeal."). Put another way, the inconsistencies in Officer Nunez's accounts, and those between his accounts and that of Officer Boland, might be excusable if there were some external corroborating evidence of loud music. But based on all of these factors, the Court ultimately cannot credit their testimony as to the volume of the music that day.

In response to these concerns, the Government contended at oral argument that, in order to decline to credit the officers' testimony, the Court would need to find that officers were engaged

10

in a broad conspiracy to falsify an excessive noise charge. Jan. 29 Hearing Tr. 20-21. But the Court need not go so far. Both officers testified that they did not recall numerous details of that day, which is quite understandable for an event that happened months earlier and which neither officer testified was particularly remarkable. When officers were asked if they could remember the genre of music, neither had any recollection. Tr. 32, 60. Nor did either officer offer testimony on any basic description of the music, such as that the music had a loud bass or that it was in English, Spanish, or some other language. *Id.* It is not surprising that the officers' memories of that day may have faded with time. And the inability to recall wholly irrelevant details would of course be immaterial. *See United States v. Collins*, No. 19 Cr. 395, 2020 WL 5439658, at *6 (S.D.N.Y. Sept. 9, 2020), *aff'd*, No. 21-1291, 2023 WL 309605 (2d Cir. Jan. 19, 2023) (finding that an officer's misrecollection of the details of an arrest more than a year prior unrelated to the issue on which he was called to testify did not undermine credibility). But here, it is notable that the officers can remember essentially no details about the music whatsoever. Their inability to recall nearly *any* details about the music undermines the weight that the Court can give to their testimony purporting to describe the volume of the music that day.

## CONCLUSIONS OF LAW

### I.    Motion to Dismiss

Mr. Sewell first moves to dismiss Count IV of the indictment relating to possession of a firearm after being convicted of a crime with a sentence exceeding one year. *See* ECF No. 19. He argues that 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment because § 922(g)(1)'s lifelong, categorical ban on possessing a firearm following any felony conviction infringes the Second Amendment rights of people like Mr. Sewell to self-defense and has no comparable historical analogue. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1

(2022).  But as Mr. Sewell acknowledges, this Motion is foreclosed by Second Circuit precedent. It is therefore **DENIED**.  *See Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025).

## II.    Motion to Suppress

### A.    Probable Cause

The Government bears the burden of establishing that Mr. Sewell's arrest was supported by probable cause.  There is no dispute that, if officers had probable cause to arrest Mr. Sewell, then the firearm and drugs are admissible.  *See, e.g.*, Jan. 29 Hearing Tr. 2-3.  Conversely, if the arrest was invalid, the evidence must be suppressed.  The Court concludes that the Government failed to meet its burden to show, by a preponderance of the evidence, that the officers had probable cause to arrest Mr. Sewell for excessive noise.

### 1.    Legal Standard

The Fourth Amendment to the United States Constitution safeguards "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  To prevent the "reduc[tion of] the Fourth Amendment to a form of words," *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920),[1] the Supreme Court has crafted the exclusionary rule, under which "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure," *United States v. Calandra*, 414 U.S. 338, 347 (1974).  Suppression of unconstitutionally obtained evidence is warranted under the exclusionary rule "when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights."  *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013).

---

[1] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

"On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014).

A warrant is not always necessary for an arrest to be "reasonable," but a warrantless arrest is invalid unless "the arresting officer has probable cause to believe a crime has been or is being committed." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008). "An officer has probable cause to arrest where he is in possession of reasonably trustworthy information concerning facts and circumstances sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Pabon*, 871 F.3d 164, 174 (2d Cir. 2017). This standard "is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). "Because the standard is fluid and contextual, a court must examine the totality of the circumstances [surrounding] a given arrest." *Delossantos*, 536 F.3d at 159. In so doing, courts consider the circumstances from the perspective of an objectively reasonable police officer, recognizing that the officer is entitled to draw reasonable inferences on the basis of his prior experience. *Id.*; *see also Ornelas v. United States*, 517 U.S. 690, 700 (1996). "[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).

Probable cause does not require an officer to, in hindsight, have been correct about whether the person arrested had committed a crime. But "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively*

13

reasonable." *Heien v. North Carolina*, 574 U.S. 54, 66 (2014) (emphasis in original). Generally, Courts find arrests to be reasonable in the case of statutory ambiguity so long as a reasonable officer, on the facts as they were, could have concluded that a criminal violation had occurred. *See United States v. Diaz*, 854 F.3d 197, 204-05 (2d Cir. 2017) ("In light of these conflicting precedents, Officer Aybar's belief that an apartment-building stairwell is a public place within the meaning of the open-container law was a reasonable, even if mistaken, assessment of the scope of that law at the time it was made."). But "no probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity." *United States v. Valentine*, 539 F.3d 88, 94 (2d Cir. 2008).

All parties agreed that, on a motion to suppress evidence, the Government bears the burden of proof as to establishing probable cause. *See Delossantos*, 536 F.3d at 158; Jan. 29 Hearing Tr. 3, 22. The parties also agree that, if the arrest was properly executed, the firearm and drugs were properly uncovered as a search incident to that arrest. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009); Jan. 29 Hearing Tr. 2-3.

### 2.    New York City Noise Code

New York City Administrative Code § 24-218 prohibits "unreasonable noise." The Code defines unreasonable noise as "any excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities . . . ." NYC Code § 24-203(62). This particular language was adopted after a prior version was struck down as unconstitutionally vague. *See Dae Woo Kim v. City of New York*, 774 F. Supp. 164, 170 (S.D.N.Y. 1991) (holding prior version of § 24-218 unconstitutional because the statute's then-vague "subjective standard" prohibiting "any sound which annoys . . . the . . . repose . . . of a person" "will vary with the listener" and "invite the arbitrary and discriminatory enforcement that the vagueness doctrine is designed to avoid"). The new language added the requirement that, for noise to be "unreasonable,"

14

it must be disturbing to a "reasonable person of normal sensitivities." NYC Code § 24-203(62). Whether noise "disturbs the peace of a reasonable person will depend upon what a reasonable person would expect in the context in which the noise is perceived." *Genco Importing Inc. v. City of New York*, 552 F. Supp. 2d 371, 387 (S.D.N.Y. 2008). If a particular street is "very active, bustling, and loud," "a reasonable person necessarily would have a different expectation of what is disturbing" than if the noise were made elsewhere. *Id.*

There is little caselaw on when noise goes from permissible to that which would "disturb the reasonable person." However, the parties provide a few examples. In one case, a New York state appellate court found that a police officer had probable cause for a noise violation where "he heard music so loud that it diverted his attention from his assignment, [ ] he observed the music emanating from defendant's vehicle that was between one-and-a-half to two blocks away, and [ ] when stopped, defendant asked whether the music was too loud." *Revi*, 81 Misc. 3d 142(A), 203 N.Y.S.3d 799. In another, a judge of this District found probable cause where "several" people approached a protester "to inquire why he was 'yelling' and 'screaming'"; the protester admitted to "chanting in a loud voice intended to communicate his protest to those attending the Church service"; "a neighborhood resident called 911 to complain about [the protestor's] 'yelling,' and [ ] his chanting was loud enough to be heard clearly in the 911 tape"; and officers' "arrival at the location of the protest was prompted by a noise complaint" about the individual. *Adams v. City of New York*, 226 F. Supp. 3d 261, 264, 268 (S.D.N.Y. 2016). In a third, a Kings County criminal court found "the operation of sound equipment at 10:00 PM, 2 hours after the permit allowing the operation of said equipment had expired, [was] per se unreasonable." *People v. Madson*, 10 Misc. 3d 1058(A), 809 N.Y.S.2d 483 (N.Y. Crim. Ct. 2005).

As Mr. Sewell notes, each of these cases features certain external "indicia" of unreasonable noise. Across the several cases above, these indicia include a broad range of factors that support

an officer's determination that noise was so excessive as to disturb a reasonable person of normal sensibilities in the context in which the noise was produced.  Often excessive noise violations are supported by bystander complaints, violation of a permit for the use of loud sound equipment, acknowledgement of an intent to draw attention to oneself in protest, or noise so loud that it diverted an officer's attention from their regular duties.  *See supra.*  While the Government argues that these indicia are not "required" for a finding of an excessive noise violation, USA Proposed Findings of Fact and Conclusions of Law at 10, ECF No. 32 the Court concludes that the presence such external indicia can be highly relevant to the probable cause inquiry.

### 3.    Application

There is no dispute that Mr. Sewell was arrested without a warrant; therefore, his initial burden is satisfied.  *See United States v. Rhodes*, No. 24 Cr. 579, 2025 WL 1797284, at *3 (S.D.N.Y. June 26, 2025).  Accordingly, the burden shifts to the government to prove, by a preponderance of the evidence, that officers had probable cause to arrest him for an excessive noise violation under New York City Administrative Code § 24-218.

Based on the evidence presented at the December 15 hearing, the Court concludes that the Government has failed to carry its burden.  That is, the Court cannot conclude based on the evidence before it that officers had knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that Sewell was producing "excessive or unusually loud sound."  *See* NYC Code § 24-203(62).

Unlike any of the cases cited by the parties in which probable cause was found for excessive noise, here, there are no external indicia of excessive noise, such as testimony that someone was diverted from their normal activities, a 911 call or other police complaint, or a violation of a permit. Eight officers had active body cameras, yet no music was captured by the recordings.  The absence

of complaints is notable given the officers' testimony that noise complaints are quite frequent in the area and that officers have been to this particular block for noise complaints dozens of times. Tr. 12, 26, 56, 58. Community residents have shown that they can and will report excessive noise when it is occurring. Yet, there were no such reports that day. Dozens of people are featured in the camera footage, yet no one appears to complain about loud music, no one acts in any manner suggesting sound so loud as to "disturb a person of reasonable sensibilities" is playing. And officers never asked any of them about whether they were disturbed by loud music. *See Manganiello*, 612 F.3d at 161 ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause."). Importantly, volume by itself is not determinative of whether noise is excessive—rather, it must be evaluated in "the context in which the noise [was] perceived." *Genco Importing Inc.*, 552 F. Supp. 2d at 387. And here, given the events transpired in an area that appears situated next to a high foot- and vehicle-traffic intersection, features primarily commercial establishments, and was described by an officer who has visited the block roughly 50 times as "busy," Tr. 45—the absence of any such complaints is notable. To be clear, while the absence of a noise complaint or other external indicia of excessive noise that day does not *disprove* that there was excessive noise at 3044 Valentine on the afternoon of June 5, it does distinguish this case from the ones cited by the parties.

And the Government bears the burden here. The only source of evidence that there was, in fact, excessive noise there that day is the testimony of Officers Boland and Nunez. As the Court explained above, however, it cannot credit their testimony in this regard. In brief, Officer Nunez— who misremembered an important detail in his conversation with the prosecutor—testified that he could hear the music a block away. But that testimony conflicts with that of Officer Boland, who testified that he could *not* hear the music from that distance, and that he first heard the music only

when he opened the door of his squad car after parking near Mr. Sewell.[2]  Neither officer could

recall much in the way of details, such that their testimony is ultimately entitled to little weight

regarding the sound being played from the speaker that day.  While the officers agreed that the

music was, in rather general terms, "loud," that is essentially the full extent of the Government's

evidence of a noise violation.  But the noise ordinance does not blanketly prohibit all "loud"

sounds.  Given the deficiencies in the officers' testimony identified above, the Court cannot,

without any other evidence, find that the music was so loud or of such a disturbing nature that it

would have allowed an officer to reasonably conclude that it was disturbing to a reasonable person

in the context of a "busy," commercial intersection in violation of the Noise Code.  Accordingly,

the Court concludes that the Government has failed to demonstrate that officers had probable cause

to arrest Mr. Sewell for excessive noise.

## B.    *Terry* Stop

While the Government spends almost all of its briefing on the issue of probable cause, it

also seems to argue that Mr. Sewell was properly searched pursuant to an investigative "*Terry*

Stop."  Police may "temporarily detain a person . . . even though there is no probable cause to

make an arrest," *Rhodes*, 2025 WL 1797284, at *3, if they have "reasonable, articulable suspicion

that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  The Government

argues that because "multiple police officers had either heard music from approximately a block

---

[2] To be clear, the Court does not hold that the sound must rise to the level that it can be heard a block away in order to be "excessive" within the meaning of the New York City Administrative Code, which defines "unreasonable noise" at § 24-203(62).  Nor must the Government provide evidence or expert testimony that establishes that the precise volume of a noise sound violates the decibel limits at Administrative Code § 24-218(b).  The point here is simply that the inconsistency of the two officers' testimony regarding the volume of the music, and their inability to remember any related details about it, undercuts the reliability of their attempts to describe the music from their recollections.

18

away or heard music loud enough that they believed it could have been heard from approximately a block away, seen him operate a speaker on a public sidewalk, then saw him turning down the volume when the police approached," that officers had reasonable suspicion that Mr. Sewell was engaged in criminal activity.   USA Proposed Findings of Fact and Conclusions of Law at 12-13, ECF No. 32.

Based on the evidence introduced to the record, the Court disagrees.  As the Second Circuit recently explained,

> The reasonable suspicion standard is not high.  It merely requires that a police officer be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion on the citizen's liberty interest.  Reasonable suspicion requires less than the "fair probability" of wrongdoing needed to support probable cause, and it can "arise from information that is less reliable."  In determining whether an officer has an "objective" basis for his conduct, the Court must view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training, as well as commonsense judgments and inferences about human behavior.  A mosaic of factors can contribute to a basis for reasonable suspicion, including, among other things, the suspect's behavior, the context of the stop, and the crime rate in the area. The Supreme Court has consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.

*United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (en banc).

To begin, the Court finds it difficult to adjudicate this question on the merits.  Of the close to 100 pages of briefing and hours of oral argument and factual testimony, the Government spent only a few paragraphs in its post-hearing briefing and stray comments at oral argument on the issue of reasonable suspicion.  *See generally* USA Mem. in Opp'n, ECF No. 24 (lacking any discussion of reasonable suspicion); *see also* Jan. 29 Hearing Tr. 22; USA Proposed Findings of Fact and Conclusions of Law at 12-13.  The Court finds the failure to argue reasonable suspicion in their initial Opposition to the Motion to Suppress constitutes waiver.  *See Piotrowski v. Rocky Point Union Free Sch. Dist.*, No. 18 Civ. 6262, 2023 WL 2710341, at *13 (E.D.N.Y. Mar. 30, 2023)

(finding argument "so underdeveloped that the Court deems it waived" where Plaintiff's briefing contains several references to an issue but substance of arguments proceeds entirely within other issues); *Molina v. Faust Goetz Schenker & Blee, LLP*, 230 F. Supp. 3d 279, 287 n.39 (S.D.N.Y. 2017) (finding argument waived as underdeveloped).

Even if the Court did not find this argument waived, it is noteworthy that the Government limits its reasonable suspicion arguments—made only in post-hearing briefing—to the issue of excessive noise. Accordingly, there is no officer testimony or briefing seeking to establish that officers had reasonable suspicion that Mr. Sewell was engaged in criminal activity aside from a noise violation. *Compare Rhodes*, 2025 WL 1797284, at *1, *5 (concluding that officers had established reasonable suspicion where officers testified that they had analyzed Defendant's gait, clothing, and prior arrest record to determine a likelihood that he was carrying a firearm in his waistband). Given that Mr. Sewell was sitting in what the officers describe as an area known for drug distribution, with a backpack containing a substantial amount of crack cocaine and a gun in his pants, it seems plausible that, had the officers observed Mr. Sewell for a longer period of time, they may have observed behavior that would have led them to form a reasonable suspicion that "criminal activity 'may [have] be[en] afoot.'" *United States v. Patterson*, 25 F.4th 123, 136 (citing *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014)). But the Government has not argued that these officers did so, nor did it introduce any evidence or testimony to that effect. *Compare Rhodes*, 2025 WL 1797284, at *5. The Court cannot invent arguments that the Government could have made. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (summarily reversing Fourth Circuit for transgressing the "party-presentation principle" in granting relief based on theory not advanced by party before the court).

Turning to the arguments the Government *did* make, for the same reasons that the Government failed to establish probable cause, it similarly cannot show reasonable suspicion based

20

on the evidence before the Court. As the Court has already explained, the evidence was insufficient to allow an officer to reasonably conclude that the city noise ordinance had been violated. There is also no officer testimony that officers had knowledge of prior arrests of Mr. Sewell for noise violations. Nor is there any testimony that officers sought to investigate Mr. Sewell because of his behavior in a high crime violation area. *Compare Rhodes*, 2025 WL 1797284, at *5. While the threshold for "reasonable suspicion" is lower than that for "probable cause," there is no credible testimony or evidence that supports a finding that a reasonable officer could have believed that Mr. Sewell was producing excessive noise on June 5, 2025. Thus, Mr. Sewell's arrest would not be constitutionally sound even if recharacterized as a *Terry* stop.

### C.    Remedy

As explained above, the Court concludes that the Government has failed to show that officers had probable cause to believe Mr. Sewell had violated the New York City Noise Code on June 5, 2025. Nor did officers have reasonable suspicion to engage in a *Terry* Stop.

The typical remedy for a Fourth Amendment violation is suppression of the evidence uncovered because of that violation. *Calandra*, 414 U.S. at 347. However, the exclusionary rule is only applied "when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Stokes*, 733 F.3d at 443. Mr. Sewell argues that suppression is warranted here and would vindicate the interests protected by the Fourth Amendment, which in this case, includes the freedom from arrests and searches without probable cause or reasonable suspicion, respectively. Def.'s Proposed Findings of Fact and Conclusions of Law at 20-21, ECF No. 33. Because the evidence against Mr. Sewell is entirely tied to his unlawful arrest, the Court agrees with Mr. Sewell that suppression is proper based on the entirely lacking basis for a probable cause determination.

The Court also concludes that the Government has waived any argument that Officers did not "exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Stokes*, 733 F.3d at 443. Across the multiple rounds of briefing and two opportunities for oral argument, the Government never contended that the exclusionary rule is not an appropriate remedy in this case. *See generally* USA Mem. in Opp'n; USA Proposed Findings of Fact and Conclusions of Law; Tr.; Jan 29. Hearing Tr. Accordingly, the Court treats this the issue of gross negligence as undisputed, and evidence obtained through a search incident to Mr. Sewell's arrest must be suppressed.

## CONCLUSION

For the foregoing reasons, Mr. Sewell's Motion to Dismiss Count IV is **DENIED**, and his Motion to Suppress is **GRANTED**. The Court concludes here that Mr. Sewell's arrest was unlawful and that suppression is warranted under the exclusionary rule.

The Parties are directed to file any exhibits referenced by this Court on the docket within seven (7) days of this Opinion. Such filing may be accompanied by a sealing motion.

The Clerk of Court is respectfully directed to terminate ECF Nos. 19 and 21.

SO ORDERED.

Dated: February 23, 2026

New York, New York

_____

DALE E. HO
United States District Judge

22